UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GEFT OUTDOOR LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:15-cv-01568-SEB-MJD |
| | ) | |
| CONSOLIDATED CITY OF | ) | |
| INDIANAPOLIS AND COUNTY OF | ) | |
| MARION, INDIANA, | ) | |
| DEPARTMENT OF METROPOLITAN | ) | |
| DEVELOPMENT, | ) | |
| DEPARTMENT OF CODE | ) | |
| ENFORCEMENT, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

This matter is before the Court for decision on the First Amendment issues arising

from Plaintiff's challenge to the constitutionality of Chapter 734 of the Indianapolis City-

County Code – both the original version in effect at the time this lawsuit was filed ("the

Sign Ordinance") and the recently amended version of that ordinance ("the Amended

Sign Ordinance").  Plaintiff GEFT Outdoor LLC ("GEFT") seeks to enjoin Defendants

Consolidated City of Indianapolis and County of Marion, Indiana; Department of

Metropolitan Development; and Department of Code Enforcement (collectively, "the

City") from enforcing either version of the sign ordinance on the grounds that both favor

commercial speech over noncommercial speech and contain content-based restrictions on

1

speech in violation of the First Amendment as applicable to the states under the Fourteenth Amendment, both facially and as applied to GEFT.

GEFT filed its Complaint in this action on October 5, 2015, alleging that the Sign Ordinance was violative of the free speech clause of the First Amendment because it contained content-based speech regulations similar to those found unconstitutional by the United States Supreme Court in *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218 (2015). Plaintiff's Complaint also alleges that the Sign Ordinance violated the equal protection clause of the Fourteenth Amendment, Indiana's ascertainable standards rule, and various provisions of the Indiana Constitution. On the same date it filed its Complaint, GEFT filed a Motion for Preliminary Injunction to enjoin Defendants from enforcing the Sign Ordinance on First Amendment grounds. On October 16, 2015, Plaintiff filed a Motion for Temporary Restraining Order as well as a Motion for Order on Motion for Temporary Restraining Order and Preliminary Injunction in an effort to secure a judicial determination of the First Amendment issues prior to November 5, 2015, when Plaintiff was scheduled to appear at a hearing before the Board of Zoning Appeals to address Plaintiff's petitions for variances related to the issues raised in this litigation.

We addressed Plaintiff's motion for temporary restraining order following an evidentiary hearing in an order dated November 4, 2015, granting in part and denying in part Plaintiff's motion thereby allowing the November 5 variance hearing to proceed. Plaintiff's variance petitions were subsequently denied by the Board of Zoning Appeals following the November 5 hearing.

2

On November 30, 2015, the City amended the Sign Ordinance to reflect the Supreme Court's holding in *Reed* as well as our preliminary ruling on Plaintiff's motion for temporary restraining order.  Although GEFT maintains that it is subject only to the original Sign Ordinance, and that the amendments to the Sign Ordinance are therefore irrelevant here, GEFT sought and was granted leave to file its Amended Complaint adding claims that the Amended Sign Ordinance like the original ordinance also runs afoul of the First Amendment.  GEFT also filed an Amended Motion for Preliminary Injunction, reflecting developments in the case occurring since the Court's ruling denying the temporary restraining order.

On March 4, 2016, the Court conducted an evidentiary hearing on GEFT's original and amended requests for preliminary injunctive relief during which both parties presented witness testimony, exhibits, and oral argument.  In their post-hearing briefing, the parties stipulate that, pursuant to Fed. R. Civ. P. 65(a)(2), the Court's ruling on GEFT's request for a preliminary injunction should be consolidated with a final partial judgment on liability as to the First Amendment issues.  Accordingly, having now considered the evidence adduced and arguments presented at the hearing as well as the parties' post-hearing submissions, we hold, for the reasons set forth in detail below, as follows: (1) GEFT's claims related to the original Sign Ordinance seeking declaratory and injunctive relief are denied as moot based on the passage of the Amended Sign Ordinance, but its damages claims survive; (2) the original Sign Ordinance in its entirety violates the First Amendment making the City liable to GEFT for any resultant monetary

damages it can establish; and (3) the Amended Sign Ordinance is constitutional under the First Amendment, thereby binding GEFT to its requirements.

## Findings of Fact

## I.     The Original Sign Ordinance

Chapter 734 of the City-County Code governs the manner in which signs may be displayed within the boundaries of Marion County in Indianapolis, Indiana.  Both the original Sign Ordinance and the Amended Sign Ordinance incorporate the zoning requirements set forth in Chapter 730 of the City-County Code, which require that an improvement location permit ("ILP") be obtained by a petitioner before a sign structure can be "located, erected, altered, or repaired upon land within Marion County." Indianapolis, Ind. Code § 730-300(b)(1); § 734-200 (providing that the "requirements, conditions, prohibitions and exceptions specified in Chapter 730 of this Code shall apply to all signs and sign structures in all zoning districts in Marion County, Indiana").  Both ordinances also provide that "[a]ny sign not exempted from the requirements of obtaining an ILP as noted in section 734-201, exempt signs, or identified as a prohibited sign type shall be required to obtain an ILP …." § 734-207.  The Department of Code Enforcement ("DCE") is the City governmental unit empowered to approve or deny ILPs.  § 226-303(b)(9); § 730, 300, *et seq*.  The record before us does not contain specific details regarding the permitting process, only that, in order to obtain an ILP for a particular sign, the sign-type must be one that is allowed within its intended zoning district.

## A.     "On-Premises" and "Off-Premises" Signs

4

The Sign Ordinance classifies nearly all signs as being either "on-premises" signs or "off-premises" signs.  An on-premises sign is "a sign which directs attention to a business, profession, commodity, or service offered on the property on which the sign is located."  Indianapolis, Ind. Code § 734-501.  An off-premises sign is "a sign which directs attention to a business, profession, commodity, or service offered on the property other than that on which the sign is located."  *Id.*  "Advertising" and "outdoor advertising" signs are defined by the Sign Ordinance as "any off-premises sign which directs attention to any business, profession, product, activity, commodity, or service that is offered, sold, or manufactured on property or premises other than that upon which the sign is located."  *Id.*  Advertising signs include those that are generally thought of as "billboards."

Article III of the Sign Ordinance contains the zoning and structural requirements for both on-premises and off-premises signs.  *See* § 734-300 *et seq.*  Generally, though on-premises signs are allowed in more zoning districts than off-premises signs, they are typically limited to those with a smaller sign surface area based on the length of the street frontage than are off-premises signs.  *See* §§ 734-306; 734-300 through 305.

## B.     The Noncommercial Exemption

The Sign Ordinance specifies certain exemptions to the general requirement that an ILP be obtained before erecting a sign, including an exemption for "noncommercial opinion signs" ("the noncommercial exemption").  The Sign Ordinance defines a noncommercial opinion sign as "[a] sign, which does not advertise products, goods,

businesses, or services and which expresses an opinion or point of view, such as, a political, religious, or other ideological sentiment or support or opposition to a candidate or proposition for a public election."  Indianapolis, Ind. Code § 734-501.  The definition further provides that "[a] sign which meets the definition of an on-premises sign, an off-premises sign, and/or an advertising sign, shall not be considered a noncommercial opinion sign."  *Id.*

The noncommercial exemption provides as follows:

Noncommercial opinion sign, as defined in section 734-501 shall be permitted, provided the following provisions are met:

   (1) Noncommercial opinion signs may be displayed as freestanding signs, as follows:

        a.   Number of signs per street frontage – Five (5).
        b.   Maximum sign area – Six (6) square feet.
        c.   Maximum sign height – Four (4) feet.
        d.   Setback – Not within the public right-of-way, nor within the clear sight triangular area.

   (2) Window signs – Regulated per the applicable zoning provisions pertaining to window signs.

   (3) [N]oncommercial opinion signs may be displayed on a sign face that has been legally established to display advertising signs, in the same manner and size as an advertising sign is permitted to be displayed on the same sign face.

   (4) Noncommercial opinion signs shall have no time limits.

An improvement location permit (ILP) shall not be required if the provisions noted above are satisfied.

§ 734-201(o).

A "freestanding sign" is "[a]ny sign which has supporting framework that is placed on, or anchored in, the ground and which is independent from any building or other structure."  § 734-501.  A "window sign" is "[a]ny sign that is placed: 1) inside of, and within two (2) feet of, a window; or 2) upon the window panes or glass, and is visible from the exterior of the window."  *Id.*  On-premises signs can be displayed as freestanding signs and window signs so long as they meet all the applicable zoning provisions.

### C.    Digital Component Regulations

The Sign Ordinance allows signs to contain digital components subject to certain limitations.  First, signs with digital components are permitted only in certain commercial and industrial districts, and they may not exceed forty percent of the sign's surface area.  Indianapolis, Inc. Code § 734-405(a), (b).  The content displayed may not change more than once every 15 seconds, and the sign must freeze in a "dark or blank position" in the event that it malfunctions.  § 734-405(c).  The Sign Ordinance allows on-premises signs to have digital components if they comply with these limitations.  However, the Sign Ordinance entirely prohibits off-premises signs, including advertising signs, from containing digital components.  § 734-306(a)(6) (off-premises signs may not "display[ ] video or emitting graphics"); § 734-403 (off-premises signs within 660 feet of freeway or highway right-of-way may not "display[ ] video or emitting graphics"); § 734-306(a)(6) ("No advertising sign shall be permitted which displays video or emitting graphics.").  According to the City, the prohibition of digital components on off-premises signs (in

contrast to on-premises signs) reflects its finding that off-premises signs with digital components pose a greater risk to the City's interests of safety and aesthetics than digital components on on-premises signs because off-premises signs, such as billboards, are generally significantly larger than on-premises signs and they are typically located on heavily traveled expressways with high speed limits.  Beaubien Second Aff. ¶¶ 6-8.

### D.    The City's Interest in Sign Regulation

The Sign Ordinance's "Statement of Purpose" sets forth the City's stated interests in sign regulation.  *See* Indianapolis, Ind. Code § 734-100.  In addition to the City's general interests in promoting traffic safety and preserving aesthetics, the Sign Ordinance also is directed toward achieving the following goals:

> [R]etain current residents and attract new residents to the city; to preserve and improve the appearance of the city as a place in which to live and work as an attraction to nonresidents who come to visit or trade; to safeguard and enhance property values; to protect public and private investment in buildings and open spaces; … and to promote the public health, safety, morals and general welfare.

*Id.*

## II.    The Amended Sign Ordinance

On November 30, 2015, the City amended Chapter 734 of the City-County Code to bring the ordinance "into compliance with *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015) and this Court's TRO."  Dkt. 77 at 2.  The relevant provisions of the Amended Sign Ordinance provide as follows:

- Section 734-101 ("Application of Regulations") includes a new subsection which states: "Noncommercial messages may be displayed on any sign authorized to display commercial messages."  Indianapolis, Ind. Code § 734-101(b).

- Those signs listed in Section 734-201 as being exempt from the permit and zoning requirements, including the exemption for noncommercial opinion signs, are now replaced by the single category of "yard sign," defined as a "freestanding sign accessory to the primary use of land that is located in the yard of a lot; may be permanent or temporary; and may be either an on-premises or off-premises sign" and exempted from the ILP requirement.  § 734-201(p).  Section 734-301(c)(4) provides: (a) the "maximum height of a yard sign shall not exceed 4 feet"; (b) the "maximum sign surface area of a yard sign shall not exceed 4 square feet"; (c) "yard signs shall not be located in any right-of-way"; and (d) "yard signs shall not be illuminated."  *Id.*

- The definitions of on-premises, off-premises, and advertising signs have been amended to clarify that the limitations set forth therein "[do] not apply to the content of noncommercial messages."  § 734-501(b).

The Amended Sign Ordinance retains the same definitions and specific development standards for signs as found in the original Sign Ordinance based on whether a particular sign is an off-premises, on-premises, or advertising sign.  The Amended Sign Ordinance also retains the same limitations on digital components on sign

9

structures as did the Sign Ordinance.  These amendments are those which are relevant to this litigation.

## III.    GEFT's Signs

### A.    The East and West Signs

This lawsuit challenges the City's Sign Ordinance and Amended Sign Ordinance as they relate to three signs each leased by GEFT: one sign is located at 5780 East 25th Street ("the East Sign") and a second is at 4305 West Morris Street ("the West Sign") in Indianapolis.  Both are regulated as off-premises signs, to wit, as outdoor advertising signs.  At the present, the East and West Signs display static, noncommercial opinion signs.  GEFT seeks to add digital components to the East and West Signs, which is not permitted because they are off-premises signs.  Under either version of the ordinance, GEFT is not permitted to digitize the East and West Signs, the penalties for violating this prohibition include civil penalties of $2,500 per sign for the first day and $7,500 per sign for each successive day.  In July 2015, GEFT applied for variances of development standards with the City in order to install LED components and to display digital contents on the East and West Signs.[1]  GEFT's variance requests were considered at the November 5, 2015 Board of Zoning Appeals ("BZA") hearing.  As noted above,

---

[1] In July 2015, GEFT also filed addenda with the Indiana Department of Transportation ("INDOT"), seeking permission to convert the static faces on the East and Wests Signs to digital faces.  INDOT approved both of GEFT's addenda in August 2015.

following the Court's denial of GEFT's request for TRO, the variance hearing proceeded as scheduled.

At that hearing, the Indianapolis Department of Metropolitan Development ("the DMD") presented a staff report to the BZA recommending denial of the variance petitions based on the traffic hazards caused by digital signs.  In their report, the DMD staff asserted that GEFT's "proposed digital advertising sign[s] would unnecessarily distract motorists, traveling at a high rate of speed, from other vehicles in traffic, thereby negatively affecting public safety."  Defs.' Exh. 2 ("DMD Staff Report") at 94.  The DMD staff acknowledged, however, that an industry-sponsored study had been conducted that concluded that digital billboards "are no more likely to cause traffic accidents than conventional billboards," but discounted those findings, on the grounds that the study had not been peer-reviewed and a number of its "assumptions" have been criticized.  *Id.* at 81.  In support of its recommendation that GEFT's variance petitions be denied, the DMD cited another study, one published in the Journal of Traffic Inquiry Prevention and conducted by the Virginia Tech Transportation Institute that was sponsored by the National Highway Traffic Safety Administration.  *Id.* at 82.

At the conclusion of the November 5 hearing, the BZA denied GEFT's variance petitions seeking permission to digitize its East and West off-premises signs.  On December 4, 2015, the BZA issued its written Negative Findings of Fact, (*see* Defs.' Exh. 3 ("BZA Findings")), ruling that GEFT, as the party petitioning for a variance, had failed to make the showings that: (1) the variance would not be injurious to the public health,

11

safety, morals, or general welfare; (2) the variance would not affect the use and value of adjacent properties in a substantially adverse manner; and (3) strict application of the sign ordinance would result in practical difficulties in the use of the property without the variance. *Id.*

More specifically, the BZA ruled that "[t]he conversion of a non-digital, completely static outdoor advertising sign to a digital outdoor advertising sign would be too intense for the subject site and out of character with surrounding properties." *Id.* The BZA further ruled that, in light of the conflicting studies on the traffic dangers presented by digital billboards, it was unable to conclude that GEFT's proposed digital billboards would "not be injurious to the public health, safety or general welfare of the community." *Id.* Finally, the BZA held that allowing GEFT to install its digital billboards would adversely "affect the present and future value and use of adjacent properties," and that the inability to display advertising in digital form would not result in "a practical difficulty in the use of the property because the property can still be developed and used in accordance with the current I-4-U regulations and existing variance(s)." *Id.*

### B.    The South Sign

GEFT's third sign is located at 700 West Morris Street ("the South Sign") and is subject to a variance that had been sought and received by GEFT's predecessor as a freestanding, on-premises sign. Under both the Sign Ordinance and the Amended Sign Ordinance, freestanding on-premises signs are limited to a sign surface area of no more than 390 square feet. Indianapolis, Ind. Code § 734-303(a)(5)(Table 3.00-B). GEFT's

12

South Sign is 672 square feet, which is too large for its sign type and zoning district under the size limitations set forth in both versions of the ordinance and actually was too large under the version of the ordinance in effect when the sign was erected in 1997.

Before the South Sign was erected, GEFT's predecessor had submitted a variance petition to the City, which contained detailed plans for the proposed sign and a representation that it would reference only the on-premises company, Cameron Springs. The BZA determined that because the South Sign abuts Interstate 70, given the highway's height and speed limit, "strict application" of the structural regulations of the sign ordinance then in effect would "severely hamper the petitioner and prevent it from being able to effectively identify" the business located on the premises. Defs.' Exh. A at 36. Accordingly, the BZA granted the variance request subject to the specific representations made in the variance petition. That variance continues to govern GEFT's use of the South Sign.

GEFT, who now leases the South Sign, seeks to display off-premises signs and noncommercial messages on it, contending that both the Sign Ordinance and the Amended Sign Ordinance prohibit it from doing so. As noted above, GEFT is permitted to display noncommercial messages on the South Sign pursuant to this Court's TRO ruling.

**<u>Conclusions of Law</u>**

**I.      Mootness**

13

The doctrine of mootness derives from the jurisdictional limits imposed by Article III of the Constitution, which mandates that federal courts "may only adjudicate actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988).  Federal courts therefore must abjure a decision on a question that has been rendered moot by intervening factual events in order to avoid issuing "advisory" opinions in violation of Article III. *See Deakins v. Monaghan*, 484 U.S. 193, 199 (1988).  "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citations omitted).

The party raising the issue of mootness has the burden of establishing it.  *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 98 (1993).  A properly brought case becomes moot only where "it can be said with assurance that 'there is no reasonable expectation …' that the alleged violation will recur" and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (citations omitted).  As long as the plaintiff has "a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Clarkson v. Town of Florence*, 198 F. Supp. 2d 997, 1004 (E.D. Wis. 2002) (citing *Ellis v. Bhd. of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 443 (1984)).

The City asserts that GEFT's claims regarding the constitutionality of the original Sign Ordinance have become moot by the passage of the Amended Sign Ordinance. GEFT rejoins that its claims challenging the Sign Ordinance are not moot because, at

least with regard to its East and West Signs, GEFT remains subject to the pre-amendment ordinance under Indiana Code § 36-7-4-1109.

Section 1109 provides in relevant part as follows:

[I]f a person files a complete application as required by the effective ordinances or rules of a local governmental agency for a permit with the appropriate local governmental agency, the granting of the permit, and the granting of any secondary, additional, or related permits or approvals required from the same local governmental agency with respect to the general subject matter of the application for the first permit, are governed for at least three (3) years after the person applies for the permit by the statutes, ordinances, rules, development standards, and regulations in effect and applicable to the property when the application is filed, even if before the issuance of the permit or while the permit approval process is pending, or before the issuance of any secondary, additional, or related permits or approvals or while the secondary, additional, or related permit or approval process is pending, the statutes, ordinances, rules, development standards, or regulations governing the granting of the permit or approval are changed by the general assembly or the applicable local legislative body or regulatory body.

IND. CODE § 36-7-4-1109(c).  GEFT claims that it is "grandfathered" under this ordinance and entitled to its protections, having filed for the ILP for the West Sign on February 10, 2015 and for the ILP for the East Sign on March 10, 2015, when the original Sign Ordinance was in effect, which governs any "secondary, additional, or related permits or approvals" with respect to the West and East Signs, including GEFT's digital variance requests, until at least February 10, 2018 and March 10, 2018, respectively. GEFT argues its claims brought under the original Sign Ordinance accordingly are not moot.

We do not interpret § 1109 in the manner GEFT seeks to have it applied here because to give effect to § 1109 in that manner would lead to an untenable result.  The

statute provides that a permit application and any subsequent related approvals are to be governed for at least three years by the ordinance in effect and applicable to the subject property when the original application was filed, but that assumes the statute is constitutional, which is no longer true.  Here, the ordinance in effect at the time GEFT applied for and received its ILPs has been ruled unconstitutional for the reasons detailed *infra*.  A party derives no rights based on an unconstitutional statute; "[a]n unconstitutional law is void, and is as no law." *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016) (quoting *Ex Parte Siebold*, 100 U.S. 371, 376 (1879)).  Having determined that the Sign Ordinance is unconstitutional, § 1109 cannot be deemed to resurrect its terms and provisions for purposes of creating or maintaining rights for any party's benefit, including GEFT's.  GEFT's assertable rights can only emanate from a constitutional ordinance and the original Sign Ordinance has been repealed and replaced.

This does not mean, however, as the City argues, that all of GEFT's claims related to the original Sign Ordinance are moot.  "[R]epeal of a law will not render a claim moot if the plaintiff is seeking relief from alleged past rather than future unconstitutional action." *Clarkson*, 198 F. Supp. 2d at 1004 (citing *Mumford v. Basinski*, 105 F.3d 264, 273-74 (6th Cir. 1997)).  GEFT has alleged that by being governed by the unconstitutional Sign Ordinance, its advertising opportunities were harmed in various ways, for which it seeks an award of money damages to compensate for those losses. "Where a repeal leaves unaffected an extant claim for monetary damages, a plaintiff continues to have a sufficient personal stake in the outcome of the controversy to defeat

application of the mootness doctrine."  198 F. Supp. 2d at 1004 (citations omitted).

Accordingly, GEFT's claims for money damages to compensate it for any such losses are

not moot.

However, GEFT's claims for declaratory and injunctive relief have been mooted

by the passage of the Amended Sign Ordinance.  The City has amended the ordinance for

the express purpose of complying with *Reed* and as we applied that holding in our

temporary restraining order.  Since there is no realistic likelihood by the City that it will

attempt to enforce the original Sign Ordinance, declaratory or injunctive relief to

foreclose that possibility is not necessary.  Thus, GEFT's claims for such relief are moot.

*See id.* at 1004-1005.

We turn next to address GEFT's First Amendment challenge to both the Sign

Ordinance and the Amended Sign Ordinance.

## II.      The Constitutionality of the Sign Ordinance

The First Amendment, as applied to the states and local governments through the

Fourteenth Amendment, prohibits the government from "restrict[ing] expression because

of its message, its ideas, its subject matter or its content."  *Reed v. Town of Gilbert, Ariz.*,

135 S.Ct. 2218, 2226 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95

(1972)).  Laws that are content-based, to wit, laws that "target speech based on its

communicative content," are "presumptively unconstitutional and may be justified only if

the government proves that they are narrowly tailored to serve compelling state

interests."  *Id.*  A law is content-based if "'on its face' [it] draws distinctions based on the

17

message a speaker conveys." *Id.* at 2227. "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* Even facially content-neutral regulations will be considered content-based if they "cannot be 'justified without reference to the content of the regulated speech,' or were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

In *Reed*, the Supreme Court addressed First Amendment protections as applied to a sign ordinance enacted by and in effect in the Town of Gilbert, Arizona. That ordinance banned outdoor signs without a permit, but provided 23 exemptions for specific sign types, and imposed various restrictions on different sign types depending on which exemption applied. The law exempted "ideological signs" and "political signs" from the ban, but imposed strict regulations on other sign types. Plaintiffs (a church and its pastor) challenged the law after the Town of Gilbert repeatedly cited the church for its failure to comply with the regulations imposed by the "Temporal Directional Signs Relating to a Qualifying Event" exemption, which encompassed signs directed at passersby that advertised events sponsored by a non-profit. *Id.* at 2225. The regulations applicable to such signs, which included, *inter alia*, size restrictions and time limits, were more restrictive that the limitations placed on ideological or political signs.

Justice Thomas, joined by five other Justices, ruled that the exemptions in *Reed* were content-based and thus did not survive strict scrutiny under the First Amendment.

In reaching this conclusion, the Court emphasized that the government's motivation or intent is not determinative of whether a content-based restriction on speech is subject to strict scrutiny; thus, "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* at 2228. The Court also made clear that "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 2230. *Reed* further clarified that the fact that a distinction is speaker-based or event-based (rather than idea-based) does not automatically render it content-neutral. *Id.* at 2230-2231.

Justice Alito, joined by Justices Sotomayor and Kennedy, joined the majority opinion and wrote a concurring opinion that included a non-exhaustive list of signage regulations that would not trigger strict scrutiny, including, *inter alia*, "[r]ules distinguishing between on-premises and off-premises signs," "[r]ules distinguishing between lighted and unlighted signs," and "[r]ules that distinguish between signs with fixed messages and electronic signs with messages that change." *Id.* at 2233 (Alito, J., concurring). Justices Ginsberg, Breyer, and Kagan concurred only in the judgment while disagreeing with the principle that any content-based regulation necessarily triggers strict scrutiny.

Applying *Reed* to the case before us, it is clear that the Sign Ordinance's noncommercial exemption constituted a facially content-based restriction, which would subject it to strict scrutiny. The City does not seriously contend otherwise. As explained in *Reed*, "[g]overnment regulation of speech is content based if a law applies to particular

speech because of the topic discussed or the idea or message expressed." *Id.* at 2227 (citation omitted). The Sign Ordinance's noncommercial exemption defined "noncommercial opinion signs" on the basis of whether a sign "expresses an opinion or point of view, such as, a political, religious, or other ideological sentiment or support or opposition to a candidate or proposition for a public election." Indianapolis, Ind. Code § 734-501. The Sign Ordinance thus clearly subjected noncommercial opinion signs to restrictions different from other sign types that also received exemptions from the ILP requirement, including, *inter alia*, "real estate signs" and "temporary signs for grand openings and city-recognized special events," all of which were also defined by their content.

Because the noncommercial exemption constituted a facially content-based regulation of speech making it subject to strict scrutiny under *Reed*, it could pass constitutional muster only if the City were able to demonstrate that the distinctions in regulations based on content "further[ed] a compelling interest and [were] narrowly tailored to achieve that interest." *Reed*, 135 S.Ct. at 2231 (quoting *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S.Ct. 2806, 2817 (2011)). As with the ordinance under review in *Reed*, the only governmental interests the City here has offered in support of the noncommercial exemption are the preservation of aesthetic appeal and traffic safety.

Assuming that the City's stated reasons actually qualify as compelling government interests, it has failed to establish that the noncommercial exemption is narrowly tailored

to further those interests. In that regard, the City has offered no evidence to show that noncommercial opinion signs erected on off-premises advertising sign faces, which are limited to window and freestanding displays no larger than six square feet for on-premises sign faces, serve either of these interests.  Nor is there evidence to support a regulatory distinction between exempted sign types.  For example, while noncommercial opinion signs were exempted only when they were displayed on advertising sign faces, window signs, or freestanding signs up to six square feet, "temporary signs for grand openings and city-recognized special events" were allowed to be displayed on 32 square foot sign faces.  The City has offered no explanation for these differing regulations that would demonstrate their narrow tailoring in furtherance of its compelling interests in aesthetics and traffic safety.  Accordingly, we rule that the noncommercial exemption violates the First Amendment.

Although we did not conduct a severance analysis as part of our temporary restraining order, upon further consideration, we are of the view that invalidating the noncommercial exemption necessarily requires invalidation of the entire Sign Ordinance. An ordinance that contains an unconstitutional section "cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it, and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.  The key question here is whether the legislature would have passed the statute had it been presented without the invalid features."  *State v. Barker*, 809 N.E.2d

312, 317 (Ind. 2004) (internal quotation marks and citation omitted).  We think it would not have done so here.

Because there was no provision in the Sign Ordinance which provided that noncommercial speech was permitted wherever commercial speech was permitted nor was it clear that the on-premises and off-premises definitions applied only to commercial speech, striking the noncommercial exemption does not resolve all of the ordinance's constitutional infirmities.  Without the noncommercial exemption, the Sign Ordinance is completely silent as to noncommercial opinion speech.  Such speech rarely involves a locational component; thus, presumably it would come within the off-premises definition, which means that, while on-premises sign owners previously could display such speech based on the noncommercial exemption as a freestanding sign that met certain size dimensions, when that provision is no longer applicable, on-premises sign owners no longer have a clear means by which they can display noncommercial opinion speech. Distinguishing between different categories of noncommercial speech as well as favoring commercial speech over noncommercial speech violates First Amendment guarantees, and simply striking the noncommercial exemption from the Sign Ordinance will not rescue the remaining portions of the ordinance.

The nonseverable Sign Ordinance violates the First Amendment, as we have said. The City thus is liable to GEFT for whatever monetary damages GEFT is able to prove that resulted from the impact the ordinance had on it.  That is the extent of GEFT's entitlements under the challenged ordinance.

### III.    Constitutionality of the Amended Sign Ordinance

As previously explained, the City amended the Sign Ordinance on November 30, 2015, by removing the noncommercial exemption and adding the following provision: "Noncommercial messages may be displayed on any sign authorized to display commercial messages."  Indianapolis, Ind. Code § 734-101(b).  The definitions of "on-premises," "off-premises," and "advertising signs" remained the same as those in the original Sign Ordinance.  Similarly, there was no change in the regulations regarding digital components for those sign types.  The City's amendments to the ordinance make clear that the limitations set forth in each of those definitions "[do] not apply to the content of noncommercial messages."  § 734-501(b).  Accordingly, under the Amended Ordinance, the on-premises and off-premises distinction now explicitly applies only to commercial speech.

GEFT argues that the on-premises and off-premises distinction that relates only to commercial signs constitutes a content-based regulation of speech subjecting it to strict scrutiny under the test set forth in *Reed*.  The City rejoins that *Reed* addressed only noncommercial speech and did not change or otherwise affect the long line of precedent holding that commercial speech is subject to intermediate rather than strict scrutiny under the test set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).  Because the Amended Sign Ordinance provides that the on-premises/off-premises distinction applies only to commercial speech, the City maintains that *Reed* has no application here.

23

This issue appears to be an open question following *Reed*.  Few courts have had occasion to address it post-*Reed*, but the majority of courts that have considered the question have held that the holding in *Reed* is limited to noncommercial sign regulations and does not alter or otherwise affect precedent relating to municipal regulations of commercial signs.  *See Contest Promotions, LLC v. City and County of San Francisco*, No. 15-cv-00093-SI, 2015 WL 4571564, at *4 (N.D. Cal. July 28, 2015) ("*Reed* does not concern commercial speech, and therefore does not disturb the framework which holds that commercial speech is subject only to intermediate scrutiny as defined by the *Central Hudson* test."); *California Outdoor Equity Partners v. City of Corona*, No. CV 15-03172 MMM (AGRx), 2015 WL 4163346, at * 10 (C.D. Cal. July 9, 2015) ("*Reed* does not concern commercial speech, let alone bans on off-site billboards.  The fact that *Reed* has no bearing on this case is abundantly clear from the fact that *Reed* does not even *cite Central Hudson*, let alone apply it.") (emphasis in original); *Citizens for Free Speech, LLC v. County of Alameda*, No. C14-02513 CRB, 2015 WL 4365439, at *13 (N.D. Cal. July 16, 2015) (holding that *Reed* does not alter the analysis for laws regulating off-site commercial speech).  *But see Thomas v. Schroer*, No. 2:13-cv-02987-JPM-cgc, 2015 WL 4577084, at *4 (W.D. Tenn. June 24, 2015) (granting the plaintiff's request for temporary restraining order based on likelihood of success of establishing that town's on-site/off-site distinction regulating *noncommercial* speech was content-based and subject to strict scrutiny under *Reed*).

In deciding how we should address this as yet unresolved issue, we invoke the well-established principle that "if a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions. *Agostini v. Felton*, 521 U.S. 203, 207 (1997) (quotation marks and citation omitted).  Since *Reed* did not pertain to commercial speech and omitted any mention of *Central Hudson* and its progeny, including *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), in which the Supreme Court directly addressed the issue of on/off-premises regulations in the commercial context, we have adopted the approach taken by a majority of the courts who have addressed the issue and hold that, since *Reed* does not change the controlling precedent, the Amended Sign Ordinance's on/off-premises distinction, which applies only to commercial speech, is subject to intermediate rather than strict scrutiny.[2]

Under *Central Hudson*, commercial speech is entitled to First Amendment protection only if it concerns a lawful activity and is not misleading.  Once a court finds

---

[2] Even if we were to find that *Reed* applies to require strict scrutiny of the challenged provisions of the Amended Sign Ordinance, that conclusion would be based on at best a shaky footing, given that "at least six Justices continue to believe that regulations that distinguish between on-site and off-site signs are not content-based and therefore do not trigger strict scrutiny."  *Contest Promotions*, 2015 WL 4571564, at *4. Although the definitions embrace to a limited extent an analysis of the message conveyed by the sign, that distinction primarily relates to the location of the sign, which is a content-neutral factor.  This view is in line with the non-exhaustive list of regulations cited in Justice Alito's concurrence in *Reed*, joined in by Justices Sotomayor and Kennedy, as examples of regulations that would not be considered content-based and thus not subject to strict scrutiny.  While not binding, we agree with the City that Justice Alito's analysis is meaningful here, especially given the majority opinion's silence on the issue.

that the speech is entitled to protection, any government restriction of that speech must meet the following three-part test: (1) the restriction must seek to further a substantial governmental interest; (2) the restriction must directly advance the government's interest; and (3) the restriction must reach no further than necessary to accomplish the given objective.  *Central Hudson*, 447 U.S. at 563-66.

Neither party suggests that the commercial speech at issue here involves unlawful activity or is misleading.  Nor is it disputed that the City's stated interest in its on-premises/off-premises and digital regulations, to wit, traffic safety and aesthetics, are significant government interests.  Accordingly, we turn to the remaining two prongs of the *Central Hudson* test: whether the on/off-premises regulations, including the digital regulations, directly advance the City's stated interests in preserving aesthetics and traffic safety and, if so, whether they are narrowly tailored.

Having found that *Reed* does not abrogate controlling precedent addressing the constitutionality of municipal regulations that distinguish between on-premises and off-premises commercial speech, those decisions inform our review of GEFT's First Amendment claim.  In *Metromedia*, the Supreme Court addressed a city ordinance that, among other regulations, allowed on-premises advertising but prohibited off-premises advertising on billboards.  453 U.S. at 493-496.  A majority of the Court upheld the regulation as applied to commercial speech,[3] focusing the analysis on whether the subject

---

[3] San Diego's ordinance also banned noncommercial signage.  For purposes of its analysis, the Court separately addressed the commercial and noncommercial applications of the law. *Metromedia*, 453 U.S. at 506-507.  A majority of the Court upheld the ban as it applied only to

regulation directly advanced the San Diego's interests in traffic safety and aesthetics. The Court noted that the restriction was based on "the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." *Id.* at 509.  Further, the Court observed that "[i]t is not speculative to recognize that billboards, by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" *Id.* at 510.  In reaching the conclusion that San Diego's ban on off-premises commercial advertising on billboards directly advanced the city's stated interests, the Court rejected the argument that San Diego "denigrates its interest in traffic safety and beauty and defeats its own case by permitting onsite advertising and other specified signs." *Id.* at 510-511.  In rejecting this view, the Court relied on the following three grounds: first, the distinction between on-site and off-site advertising did not prevent the ordinance from directly advancing the city's interests; second, it was reasonable for San Diego to believe that off-premises advertising was more of a danger to its goals because of the periodically changing content; and finally, San Diego was entitled to value one type of commercial speech (on-premises advertising) over another (off-premises advertising).  *Id.* at 511-512.

Applying the same analysis in *Metromedia*, the Seventh Circuit held in *Lavey v. City of Two Rivers*, 171 F.3d 1110 (7th Cir. 1999), that the city's sign ordinance, which distinguished between on-premises and off-premises signs and regulated each sign type

---

commercial advertising, but a plurality ultimately overturned the ordinance based on its being a regulation of noncommercial speech. *Id.* at 512-521.

differently, survived intermediate scrutiny.  The Two Rivers ordinance defined "off-premises sign" as "[a] sign which advertises goods, products, facilities or services not necessarily on the premises where the sign is located, or directs persons to a different location from where the sign is located" and "on-premises sign" as "[a]ny sign identifying or advertising a business, person, activity, goods, products or services located on a premises where the sign is installed and maintained."  *Id.* at 1111-1112.  This is similar to the on/off-premises distinction in the Amended Sign Ordinance.  The Two Rivers ordinance also contained a provision stating that "[n]otwithstanding any other provision contained herein to the contrary," noncommercial messages could be displayed "on any authorized sign."  *Id.* at 1112-1113.  Again, consistent with the Amended Sign Ordinance here, the Two Rivers ordinance imposed different restrictions on each category of sign and "treat[ed] on-premises signs less stringently than off-premises signs."  *Id.* at 1112.  These restrictions included: allowing on-premises but not off-premises signs in conservancy and residential districts; allowing a greater number of on-premises signs than off-premises signs in business and industrial districts; placing size and spacing limitations on off-premises signs located near highways but not similarly situated on-premises signs; and prohibiting off-premises signs from being located near residential properties and districts.  *Id.* at 1112.

In *Lavey*, our court of appeals rejected plaintiff's contention that the ordinance was "impermissibly underinclusive because it exempt[ed] noncommercial and other signs from the restrictions on off-site advertising."  *Id.* at 1115.  Holding that the plain

28

language of the ordinance established that it was "'carefully-crafted' to meet the safety and aesthetic goals [the city] articulate[d]," (*id.*), the on/off-premises distinction was upheld as a constitutional regulation of commercial speech.

The Amended Sign Ordinance defines on-premises and off-premises signs in a manner nearly identical to the provisions in the Two Rivers ordinance, placing restrictions on the size, location, and spacing for each sign type similar to the restrictions that the Seventh Circuit determined in *Lavey* to have been narrowly tailored to directly advance the municipal interests of promoting traffic safety and aesthetics. Despite this precedent, GEFT argues that the City has failed to present evidence in support of its position that the on/off-premises distinction, particularly with regard to the prohibition on digital components on off-premises signs, does in fact advance the City's stated purposes for those regulations. We disagree with GEFT's assertion. The City has explained that off-premises signs (billboards) are subject to greater regulation because they are generally larger than on-premises signs and are predominantly located along busy highways and expressways, which pose a greater risk to the City's interests in traffic safety and aesthetics. Although it is true that the burden of justifying a restriction on commercial speech "is not satisfied by mere speculation or conjecture," *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993), courts have routinely found, as shown by the analysis in *Metromedia* and its progeny, that in the area of billboard regulation the impact on aesthetics and traffic safety are legitimate reasons for regulating them, even without relying on detailed reports and scholarly or governmental studies to justify those

29

regulations.  *See Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477,

503 (S.D.N.Y. 2009) (collecting cases).

GEFT argues that when the City mandated that off-premises advertising be

displayed only on billboards, it created a false linkage between off-premises advertising

and the increased hazards of billboards, (e.g., size, proximity to highways and

expressways, etc.), and did so simply to justify favoring on-premises over off-premises

advertising.  In advancing this argument, GEFT faults the City for having failed to

establish that on-site advertising that is less strictly regulated by the Amended Sign

Ordinance is any less dangerous or aesthetically pleasing than off-site advertising that is

more strictly regulated.  Without this evidentiary link, "the credibility of the

government's rationale for restricting speech in the first place" is diminished.  *City of*

*Ladue v. Gilleo*, 512 U.S. 43, 52 (1994).  GEFT's argument in essence is that because the

ordinance is underinclusive, the Amended Sign Ordinance fails to directly advance the

City's interests in traffic safety and aesthetics.

This argument was specifically rejected in *Metromedia*.  A municipality is

permitted to value one type of commercial speech over another when it has valid reasons

for doing so.  *See Metromedia*, 453 U.S. at 512.  In *Metromedia*, the Court acknowledged

that a city "may believe that offsite advertising, with [its] periodically changing content,

presents a more acute problem than does onsite advertising."  *Id.* at 511.  Likewise here,

the City has shown similar concerns underlying its view that off-premises advertising

tends to be more problematic by allowing businesses to advertise for commercial

enterprises located elsewhere than on their own premises, which often creates more visual clutter and confusion than signs identifying the on-premises business and advertising goods and services offered on the property.  This is a reasonable basis for the City's approach that distinguishes between on-premises and off-premises advertising in light of its interests in traffic safety and aesthetics.  Even more important, however, is the Court's conclusion in *Metromedia* that "the city could reasonably conclude that a commercial enterprise – as well as the interested public – has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere."  *Id.* at 512.  The City's legislative judgment here mirrors those concerns, constraining us from overruling that decision.  Accordingly, we find that the City's on/off-premises regulations are constitutionally permissible given that they directly advance the City's interests in aesthetics and traffic safety.

We reach the same conclusion with respect to the Amended Sign Ordinance's digital regulations.  The Amended Sign Ordinance does not permit any sign to be one hundred percent digital.  Instead, the ordinance restricts to no more than forty percent of an on-premises sign the utilization of digital components.  It imposes additional restrictions on on-premises signs with digital components, including limiting the frequency with which the message changes and requiring that the sign go dark in the event of a malfunction.  We do not construe this narrow exception to the digital ban to swallow the rule or to undermine the City's overarching goals of traffic safety and

31

aesthetics.  Even the inclusion of an exception for on-premises signs does not defeat or overcome the regulation's advancement of the City's interests.

Regarding the final element of the *Central Hudson* test, we hold that the City's on/off-premises regulations, including the ban on digital billboards, are narrowly tailored and not more extensive than necessary to serve the City's stated interests.  A regulation is narrowly tailored if it "promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Rock Against Racism*, 491 U.S. at 799. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest … the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.  Narrow tailoring requires only a reasonable fit, not a perfect fit.  *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) ("[T]he case law requires a reasonable fit between the legislature's ends and the means chosen to accomplish those ends.") (internal quotation marks and citation omitted).

As discussed above, the Seventh Circuit in *Lavey* found that on/off-premises regulations that were nearly identical to those contained in the Amended Sign Ordinance satisfied the narrow tailoring requirement aimed at directly advancing the city's interests in traffic safety and aesthetics.  171 F.3d at 1115.   There is no principled basis for a contrary conclusion here, given the similarities between the on/off-premises regulations at issue in both cases.

The Amended Sign Ordinance's ban on digital off-premises signs also satisfies the final prong of the *Central Hudson* test.  In *Metromedia*, the Court held that "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them."  453 U.S. at 508.  We are bound by the prevailing caselaw as well as common sense both of which support the conclusion that billboards "pose distinctive problems" related to traffic safety and aesthetics.  *See Gilleo*, 512 U.S. at 48.  Particularly with regard to digital billboards, other courts have also recognized that "[i]t is not unreasonable for municipalities to draw distinctions between digital and static billboards because their increased visibility and changing display have a greater effect on safety and aesthetics."  *Hucul Advertising, LLC v. Charter Tp. of Gaines*, No. 1:11-CV-682, 2012 WL 4052289, at *5 (W.D. Mich. Sept. 14, 2012).  Accordingly, we hold that the City's ban on off-premises digital signs is not broader than necessary and therefore satisfies the narrowly tailored requirement.

For these reasons, we hold that the Amended Sign Ordinance passes intermediate scrutiny, and that the revised ordinance is therefore facially valid.  GEFT also presents no persuasive evidence in support of its as-applied challenge to the on/off-premises regulations, including the digital ban on off-premises signs.

**IV.   Conclusion**

For all of the reasons explicated above, the Court declares that: (1) GEFT's claims related to the original Sign Ordinance seeking declaratory and injunctive relief are denied

as moot based on the passage of the Amended Sign Ordinance, but its damages claims survive; (2) the original Sign Ordinance in its entirety violates the First Amendment making the City liable to GEFT for any resultant monetary damages it can establish; and (3) the Amended Sign Ordinance is constitutional under the First Amendment, thereby binding GEFT to its requirements.  GEFT's First Amendment money damages claims and the remaining substantive claims alleged in its Second Amended Complaint will proceed accordingly.

IT IS SO ORDERED.

Date: _____5/20/2016_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Charles R. Whybrew
LEWIS WAGNER LLP
cwhybrew@lewiswagner.com

A. Richard Blaiklock
LEWIS WAGNER, LLP
rblaiklock@lewiswagner.com

Andrew J. Mallon
OFFICE OF CORPORATION COUNSEL
andy.mallon@indy.gov

Daniel  Bowman
OFFICE OF CORPORATION COUNSEL
daniel.bowman@indy.gov

Pamela G. Schneeman
OFFICE OF CORPORATION COUNSEL
pamela.schneeman@indy.gov